**NORTHERN NATURAL GAS COMPANY, Appellant,**

v.

**CONOCO, INC., Appellee.**

No. 08–95–00342–CV.

Court of Appeals of Texas, El Paso.

Dec. 19, 1996.

Rehearing Overruled Feb. 5, 1997.

Eugene A. Cook, Bracewell & Patterson, L.L.P., Houston, for appellant.

G. Luke Ashley, Thompson & Knight, Dallas, for appellee.

Before BARAJAS, C.J., and LARSEN and CHEW, JJ.

## OPINION

LARSEN, Justice.

Defendant appeals from an adverse judgment, following jury trial, in a breach of contract case. We reverse and remand for new trial.

### FACTS

Our consideration of this appeal requires us to review the trial court's construction of a contract and two amendments. In 1979, appellant Northern Natural Gas Company entered into a natural gas transportation and processing agreement (the "Agreement") with CRA, Inc. Appellee Conoco, Inc. is a successor-in-interest to CRA. Conoco, like CRA before it, gathers and processes natural gas in several processing plants near San

Angelo, Texas. Northern is an interstate natural gas pipeline. At the time it entered into the Agreement, Northern had contracts to purchase gas from certain gas producers along CRA's (later Conoco's) gas gathering facilities. Northern agreed to deliver, and CRA agreed to accept, "all gas for gathering, compressing and processing in keeping with all the quantity and other provisions of [Northern's] various gas purchase contracts in effect from time to time." The Agreement was to be effective from the date of signing and "for so long as the various Gas Purchase Contracts dedicated hereunder remain in effect, but not less than twenty (20) years, unless terminated pursuant to the terms herein."

In May 1981, the parties executed a letter agreement to make specified wells, rather than specified acreage, covered under the Agreement "to avoid the blanket-type coverage of dedicated acreage with new well additions." The parties again amended the Agreement in July 1984 to include several new wells. The 1984 amendment provided, "[e]xcept as herein specifically supplemented and modified, all terms and conditions of (the Agreement) ... shall remain in full force and effect." The 1984 amendment specifically supplemented and modified the "Processing Consideration," "Gas Gathering and Compression," and "Ownership and Disposition of Plant Products," terms of the Agreement. No other terms were modified. The parties further agreed in the 1984 amendment "that [the original Agreement] applies to the wells on Exhibit A for the productive life of the wells. Similarly, once a well is placed on Exhibit B, the terms of this Amendment shall apply to the well for its productive life." Exhibit A included wells previously covered by the Agreement and Exhibit B included the new wells added in the 1984 amendment.

When Northern and CRA first entered into the Agreement, the natural gas industry was heavily regulated by the federal government. Northern claims that deregulation, beginning in the late 1970s, made the purchase and resale of natural gas economically infeasible for interstate natural gas pipelines. In response to the deregulated environment, Northern began canceling and buying out its contractual obligations to purchase gas from producers, including the purchase contracts covered by the Agreement. By the early 1990s, Northern was no longer purchasing any natural gas and it operated only as a carrier pipeline transporting natural gas for others.

Conoco, which had purchased CRA's facilities and contracts in 1989, sued Northern in 1992 alleging that the Agreement and its amendments require Northern to purchase all output from the wells listed in the Agreement for the productive life of those wells, and deliver that quantity to Conoco for processing. Northern argued that the Agreement requires Northern to deliver gas to Conoco "in keeping with all the quantity and other provisions of [Northern's] various gas purchase contracts in effect from time to time." Northern urged that since it had no gas purchase contracts in effect, the Agreement imposed no obligation to deliver gas to Conoco. At trial, the trial court agreed with Conoco and instructed the jury that,

[T]he Agreement requires both parties to perform certain obligations. Northern Natural Gas Company is obligated by the Agreement to purchase and deliver to Conoco Inc. *all gas reserves from dedicated wells during the productive life of the wells.* Conoco Inc. is obligated by the Agreement to gather, compress and process all gas purchased and delivered by Northern Natural Gas Company. [Emphasis added].

The jury found that Northern breached the Agreement, and awarded Conoco over $20 million for Conoco's lost gas processing profits. Northern challenges the verdict in nine points of error.

### DISCUSSION

In its first point of error, Northern asserts the trial court erred in interpreting the terms of the Agreement. Northern's argument is twofold taking exception to: (1) the trial court's finding that the Agreement requires Northern to purchase and deliver *all* gas reserves from the wells dedicated to the Agreement; and (2) that it must do so for the entire productive life of each dedicated well. If a contract is worded so that it

can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court will construe the contract as a matter of law. *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968); *First City Nat'l Bank of Midland v. Concord Oil Co.*, 808 S.W.2d 133, 137 (Tex.App.—El Paso 1991, no writ). Legal conclusions of a trial court are always reviewable on appeal. Trial court findings on the law are given no particular deference. Rather, as the final arbiter of the law, the appellate court has the power and the duty to independently evaluate the legal determinations of the trial court. *Sears, Roebuck and Co. v. Nichols*, 819 S.W.2d 900, 903 (Tex. App.—Houston [14th Dist.] 1991, writ denied); *MJR Corp. v. B & B Vending Co.*, 760 S.W.2d 4, 10 (Tex.App.—Dallas 1988, writ denied). We do not find the Agreement and its amendments to be ambiguous. Thus, we must independently evaluate the legal determination of the trial court and ascertain the appropriate construction of the Agreement. *Id.*

 In interpreting contracts, the primary concern of courts is to ascertain and to give effect to the intentions of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *Duracon, Inc. v. Price*, 817 S.W.2d 147, 149 (Tex. App.—El Paso 1991, writ denied). This requires the court to examine and consider the entire instrument and reach a decision so that none of the provisions will be rendered meaningless. *Id.* Further, a contract is to be construed in accordance with its plain language, and it is presumed that the parties intended each clause to have some affect. *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex.1983). The court will not strike down any portion of the contract unless there is an irreconcilable conflict. *Id.*

### Quantity

 We turn first to the question of whether the Agreement and its amendments require Northern to purchase and deliver to Conoco all gas reserves from wells dedicated to the Agreement. The Agreement requires only that Northern deliver gas "in keeping with all the quantity and other provisions of [Northern's] various gas purchase contracts in effect from time to time." The Agreement nowhere requires that the referenced gas purchase contracts be for the entire output of the dedicated wells. Conoco appears to argue that because Northern's gas purchase contracts in effect at the time the Agreement was executed were for all gas reserves, the terms of those gas purchase contracts are somehow forever incorporated into the terms of the Agreement. Conoco cites no authority for this proposition.

We believe Conoco's interpretation would render meaningless the phrase "in keeping with all the quantity and other provisions of [Northern's] various gas purchase contracts in effect from time to time." This language, by its clear and plain terms, anticipated changes in Northern's gas purchase contracts. We must presume the parties intended the language to have some meaning and we may not simply do away with it. *Ogden*, 662 S.W.2d at 332. Accordingly, we find that the plain language of the contract cannot be stretched to require Northern to purchase and deliver to Conoco *all* gas reserves from wells covered by the Agreement. Rather, Northern is required only to deliver a quantity of gas that is in keeping with Northern's gas purchase contracts for each covered well.

### Duration of the Agreement

 We next consider whether the trial court erred in finding that the duration of the Agreement is equal to the productive life of the wells. The original "Term" clause of the Agreement read:

This agreement shall be effective from the date hereof and shall remain in force for so long as the various Gas Purchase Contracts dedicated hereunder remain in effect, but not less than twenty (20) years....

Conoco argues that the following language in the 1984 amendment effectively amends the original "Term" clause of the Agreement:

The parties agree that [the original Agreement] applies to the wells on Exhibit A *for the productive life of the wells.* Similarly, once a well is placed on Exhibit B, the terms of this Amendment shall apply to

the well *for its productive life.* [Emphasis added.]

We must construe the language in context of the entire agreement so that no clauses are rendered meaningless. *Duracon,* 817 S.W.2d at 149. The 1984 amendment also contains the following passage:

Except as herein specifically supplemented and modified, all terms and conditions of [the Agreement] ... shall remain in full force and effect.

Conoco's interpretation of the "productive life" passages as modifications to the Agreement's "Term" clause would render meaningless the language requiring a specific supplementation or modification because the "productive life" passages do not include any stated intent to amend the "Term" clause of the Agreement.

The 1984 amendment modified only three terms of the Agreement. It specifically set out the term to be modified by paragraph number and title as the term originally appeared in the Agreement. Nowhere in the writing does the 1984 amendment purport to specifically modify the Agreement's original "Term" clause. Reading the above-referenced language together, we conclude that the original "Term" clause is one of the unmodified terms of the Agreement that remain in full force and effect pursuant to the language of the 1984 amendment. Viewing the "productive life" phrases (which Conoco takes out of the context of the entire agreement) appropriately in context, it is clear that the phrases merely limit the application of the 1984 amendments to the new wells on Exhibit B and restrict changing any well's contractual status from the terms of the original Agreement to the terms of the 1984 amendment, or vice versa, during that particular well's productive life. The "Term" clause remains part and parcel of the unmodified Agreement terms that continue to apply to all wells.

### Conclusion Regarding Contractual Interpretation

The Agreement does not require Northern to deliver all natural gas reserves from dedi-

cated wells for the productive life of those wells as the trial court determined and instructed the jury. We find that the clear language of the Agreement requires only that Northern deliver gas to Conoco in keeping with its gas purchase contracts covering dedicated wells as those contracts are in effect from time to time. Northern must do so for so long as gas purchase contracts remain in effect on dedicated wells, but in no event for fewer than twenty years from the date of signing. Twenty years from the date of signing would be March 19, 1999. The trial court's interpretation and instruction allowed the jury to conclude that Northern breached the Agreement by failing to live up to a term that does not exist: to purchase and sell to Conoco *all* gas reserves from dedicated wells. Assuming a breach, the trial court's interpretation and instruction regarding the length of the term of the Agreement, the entire productive life of the wells rather than a twenty-year term ending in 1999, provided a vastly expanded damage range [1]. Accordingly, we sustain Northern's first point of error. Having done so, we need not reach the remaining points of error.

### This Court Must Remand for New Trial

■ Northern invites us to reverse and render judgment that Conoco take nothing since Northern has no gas purchase contracts in effect and therefore has no contractual duty to sell anything to Conoco. We cannot do this. The Texas Business and Commerce Code states that every contract imposes an obligation of good faith in its performance or enforcement. TEX.BUS. & COM.CODE ANN. § 1.203 (Vernon 1994). Texas case law further holds that every contract includes an element of confidence and trust that each party will faithfully perform his obligation under the contract. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 595 (Tex.1992). A breach of this contractual duty gives rise to a cause of action for breach of contract. *Id.* at 595 n. 5, *citing Picture Lake Campground,*

---

**1.** The parties do not dispute that most of the wells would continue producing until at least

2009.

*Inc. v. Holiday Inns, Inc.*, 497 F.Supp. 858, 869 (E.D.Va.1980). Conoco alleged that Northern acted contrary to the good faith obligation by arbitrarily canceling all of its gas purchase contracts. Although the Agreement requires only that Northern sell gas pursuant to the quantities in its gas purchase agreements, nothing in the Agreement permits Northern to cancel all of its contracts in bad faith. A decrease in delivery is still subject to the good faith obligation of Section 1.203 as defined in Sections 1.201(19)(honesty in fact) and 2.103(a)(2)(for merchants, honesty in fact and observance of reasonable commercial standards of fair dealing in the trade). TEX.BUS. & COM.CODE ANN. §§ 1.201(19), 2.103(a)(2)(Vernon 1994). Northern's delivery reductions are limited to good faith decreases in contractual obligations under its gas purchase agreements with producers. *Lenape Resources Corporation v. Tennessee Gas Pipeline Company*, 925 S.W.2d 565, 571 (Tex.1996). Whether Northern canceled all of its gas purchase agreements in good faith remains a question for the jury.

### CONCLUSION

 Northern raises four points of error regarding damages and two alternative points raising ambiguity of the Agreement. Our disposition of Northern's first point makes it unnecessary for us to address these points. Northern also raises two evidentiary points. Evidence that was either admissible or inadmissible pursuant to the trial court's previous interpretation of the contract, however, might well become the opposite under our construction. The trial court has never ruled on the questioned evidence in light of the contractual construction we apply in this opinion. Thus, any opinion on admissibility under our new construction would be advisory. An appellate court should not render advisory opinions. *See Olson v. Commission for Lawyer Discipline*, 901 S.W.2d 520, 522 (Tex.App.—El Paso 1995, no writ). Accordingly, we reverse the judgment of the trial court and remand the cause for proceedings pursuant to the unambiguous terms of the Agreement and its amendments as found by this court.