THE KAWASAKI SHOP OF AURORA, INC., Plaintiff-Appellee and Cross-Appellant, v. KAWASAKI MOTORS CORPORATION, U.S.A., Defendant-Appellant and Cross-Appellee.

Second District No. 2—88—1058

Opinion filed September 22, 1989.

666

Terry M. Weyna, of Burditt, Bowles & Radzius, Ltd., of Chicago, and Tyler & Hughes, P.C., of Aurora (George E. Bullwinkel and Lloyd J. Tyler, of counsel), for appellant.

William C. Murphy and Craig S. Mielke, both of Murphy, Hupp, Foote, Mielke & Kinnally, of Aurora, and Winston & Strawn, of Chicago (Edward L. Foote & Robert M. Foote, of counsel), for appellee.

JUSTICE NASH delivered the opinion of the court:

Defendant, Kawasaki Motors Corporation, U.S.A. (the Manufacturer), appeals from a judgment in favor of plaintiff, The Kawasaki Shop of Aurora, Inc. (the Dealer), for $323,690 as compensatory damages, and $79,422.50 for attorney fees, in this action for breach of contract and alleged violation of the Motor Vehicle Franchise Act (Ill. Rev. Stat. 1987, ch. 121½, par. 751 et seq.). The Manufacturer contends that the trial court erred in instructing the jury and that the verdict was against the manifest weight of the evidence.

In a cross-appeal, the Dealer contends that the trial court erred when it refused to treble the damage award, as it may do under the Act. We affirm the judgment of the circuit court in both the appeal and the cross-appeal.

The Kawasaki Shop of Aurora, Inc., maintained a Kawasaki dealership in Aurora, Illinois, under a franchise agreement entered into with Kawasaki Motors Corporation, U.S.A., in 1971. From 1971 to 1980, the business was located at Route 2 and U.S. 30 then relocated to New York Street, where it remained until 1982 when it moved to Hill Avenue. In 1980, the Dealer became a subsidiary of Capital Control, Ltd., when Capital Control acquired 100% of the stock of the Dealer from the owners, Bruce and Cathy Riemenschneider, in return for 30% of its own stock. Capital Control, which maintains a number of motorcycle sales franchises doing business as Fox Valley Cycles,

was attempting to consolidate the market in motorcycle dealerships in Aurora with the ultimate aim of operating a multiple-brand dealership from one store. Capital Control had purchased a Suzuki franchise which it intended to move to a store from which it sold Honda products, and was also negotiating to purchase a Yamaha franchise to add to the Honda and Suzuki lines in one building. Capital Control wished to move the Dealer into the same shop. In the fall of 1981 the Dealer advised the Manufacturer that it intended to move the Kawasaki franchise and did move to 419 Hill Avenue in 1982, where the Honda and Suzuki franchises were located. Yamaha moved into the same store in 1985.

Following the change of ownership of Dealer in June 1981, a new dealership agreement was entered into between the Manufacturer and Dealer which provided in relevant part:

"A. DISTRIBUTOR hereby grants to DEALER during the continuance of this Agreement the privilege of purchasing for resale at DEALER'S place of business in the city and at the location indicated above designated Kawasaki brand motorcycles, and parts and accessories therefor supplied by DISTRIBUTOR (hereinafter collectively called 'Products').

B. DEALER will not move its place of business to any new or different location than that described in Paragraph 1, or establish any additional place or places of business for the sale, servicing or display of Products without the prior written consent of DISTRIBUTOR."

While the agreement required approval by the Manufacturer prior to a move to a new or different location, a dealer is not required to get approval to take on competitive motorcycle lines, and, in contemplation of this possibility, in paragraph 11, the agreement states the dealer's responsibility to provide representation of the Kawasaki products equal to that provided other brands or lines of products also sold. The contract further provided that the Manufacturer and Dealer agree that the Dealer's area of primary responsibility for the sales and service of the Kawasaki products shall be a five-mile radius of the dealer's place of business as specified in the contract. In June 1981, when the agreement was entered, the Kawasaki dealership had been located on New York Street for about a year. However, the agreement listed the dealer location as Route 2, U.S. 30, in Aurora, the address where it had been located from 1972 until 1980. Each of the locations at which the Dealer operated its Kawasaki franchise was within a five-mile radius of the location specified in the agreement.

In September 1981, Bruce Riemenschneider met with James

Shevlet, the regional sales manager for the Manufacturer, who advised Riemenschneider that the Hill Avenue location was not suitable and he would not allow Riemenschneider to move in with Honda. In October 1981, Riemenschneider received a letter from the Manufacturer advising that Shevlet disapproved of the move from the Route 2, U.S. 30, address to the Hill Avenue location.

In February 1982, the Dealer moved from its actual location on New York Street to Hill Avenue. According to Riemenschneider, there had been no problems with the Manufacturer because of the past move, and they thought they had a good new location. In fact, the Manufacturer's district manager, Mr. Johnson, had assisted in the first move knowing that no written permission had been given. The move was within the same market area described in the contract and was made primarily to keep overhead down and to offer more convenient shopping for customers which would result in discounted prices to buyers. By letter of February 1982, effective May 1, 1982, the Manufacturer terminated Dealer's franchise contract, and it subsequently opened a new Kawasaki dealership about a mile and a half south of the Hill Avenue location to which it had objected.

The Dealer brought this action alleging that the Manufacturer's termination of the franchise violated the Motor Vehicle Franchise Act (Ill. Rev. Stat. 1987, ch. 121½, par. 751 *et seq.*) and, in a second count of its complaint, alleged that the Manufacturer had breached its dealership contract. The complaint sought treble damages under the statutory action, alleging that the Manufacturer's conduct was willful and wanton, and attorney fees. The Manufacturer counterclaimed, alleging that the Dealer had breached its dealership contract by not obtaining approval prior to the move. The jury returned verdicts under both counts of the complaint in favor of the Dealer and assessed damages at $323,690. In response to a special interrogatory, the jury also found that the Manufacturer's violations of the Motor Vehicle Franchise Act were "willful and wanton." The trial court awarded the Dealer $79,422.50 as attorney fees pursuant to the Act, but did not award treble damages which are also allowed by the statute, finding it was not warranted in this case.

On appeal, the Manufacturer contends that certain instructions to the jury relating to the application of the Motor Vehicle Franchise Act were fatally defective. We consider first its argument that the jury was improperly instructed on the issue of "site control," which the Manufacturer was alleged to have unreasonably restricted in violation of the Act.

The court gave an instruction tendered by the Dealer, as follows:

> "It shall be unlawful directly or indirectly to impose unreasonable restrictions on the motor vehicle dealer or franchisee relative to transfer, sale, right to renew, termination, discipline, site-control, compliance with subjective standards, and assertions of legal or equitable rights."

This instruction was based on section 7 of the Motor Vehicle Franchise Act, which provides:

> "Unreasonable dealer or franchise restrictions. It shall be unlawful directly or indirectly to impose unreasonable restrictions on the motor vehicle dealer or franchisee relative to transfer, sale, right to renew, termination, discipline, noncompetition covenants, site-control (whether by sublease, collateral pledge of lease, or otherwise), right of first refusal to purchase, option to purchase, compliance with subjective standards and assertion of legal or equitable rights." Ill. Rev. Stat. 1987, ch. 121½, par. 757.

The Manufacturer objected on the grounds the instruction did not define the term "site-control" or include the parenthetical explanation in the statute "(whether by sublease, collateral pledge of lease, or otherwise)." It argues that no issue of site control was present in the case, asserting that the statute intended only to prohibit a manufacturer from controlling a dealership through a property interest in the real estate and buildings from which the dealership operated. The Manufacturer considers that the legislative intent to so limit application of the site-control prohibition is apparent from the omitted, descriptive terms of "sublease, collateral pledge of lease, or otherwise." We do not agree.

■ Where instructions contain statutory language, portions of a statute which are not relevant to the evidence in the case should be deleted. (*Harris v. Day* (1983), 115 Ill. App. 3d 762, 773, 451 N.E.2d 262.) The Dealer responds that occurred here, and, as the parenthetical language of the statute was not relevant to the facts, it was properly omitted.

■ There are few Illinois cases which have considered the Motor Vehicle Franchise Act, and there is no Illinois case law interpreting its "site-control" provision. The Act has been said to have been created for the benefit of the dealers and must therefore be liberally construed to carry out the legislative intent. (*Geri's West, Inc. v. Ferrall* (1987), 153 Ill. App. 3d 579, 583, 505 N.E.2d 1348.) In *Bethesda Ford, Inc. v. Ford Motor Co.* (D. Md. 1983), 572 F. Supp. 623, cited by the Manufacturer, the court stated that "site control" took place when a leasing company owned by a motor vehicle manufacturer loaned

money to a dealer-owned company, in return for which it acquired the option to lease the facility from the dealer-owned company and sublease it back to the dealer. That court considered, under its facts, that "site control" was "the right to ensure that the property would be used exclusively as a Ford dealership for the duration of the Leasing Co. lease." (*Bethesda Ford*, 572 F. Supp. at 626.) In *Bethesda Ford*, site control became an issue because of a lease provision which imposed on the dealer the obligation to use a facility exclusively for that manufacturer's product and prohibited the dealer from switching to another franchise at that location. In *Texaco, Inc. v. A.A. Gold, Inc.* (1974), 78 Misc. 2d 1050, 357 N.Y.S.2d 951, site control also was found to have occurred through use of a lease by a franchise. However, neither case contains language suggesting that site control could occur only through use of a lease provision.

■ The Manufacturer also argues that the doctrine of *ejusdem generis* dictates the construction of the word "otherwise" in the parenthetical clause, "whether by sublease, collateral pledge of lease or otherwise." *Ejusdem generis* requires that in a statutory clause, where the word "other" follows specifically described classes of persons or things, "other" is interpreted as meaning "other such like." (*Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Clayton* (1985), 105 Ill. 2d 389, 396, 475 N.E.2d 536.) Appellate decisions teach that this rule should be followed in construing a statute unless there is something in the statute, or its context, which shows that the doctrine of *ejusdem generis* should not be applied. (*City of Chicago v. Bethlehem Healing Temple Church* (1968), 93 Ill. App. 2d 303, 309, 236 N.E.2d 357.) The Manufacturer contends that its contractual right to approve or disapprove the physical location of a dealership is not an "other such like" sublease of the real estate upon which a dealership is located, and that the Act does not suggest that the term "site control" should be so broadly construed.

The prohibition against site control in the Act protects the franchisee/dealer from being subjected to unreasonable control by the franchisor. In our view, there is no difference between termination of a leasehold because of a dealer's failure to exclusively sell the Manufacturer's products, and termination of a franchise for the same reason. The Manufacturer concedes that the sole reason for its opposition to the Dealer's move to the new location, and for its subsequent termination of the Kawasaki franchise, was the Dealer's affiliation with Honda. No argument is made that the new location would not be an appropriate site to market Kawasaki products, except that they would be in direct competition with Honda; however, the franchise agree-

ment between the Manufacturer and Dealer specifically provided for multiline dealerships.

The primary function of the court in interpreting and construing a statute is to ascertain and give effect to the legislature's intent in enacting the statute by examining the language and the statute as a whole and by determining the objective the statute seeks to accomplish and problems it seeks to remedy. (*Department of Revenue v. Smith* (1986), 150 Ill. App. 3d 1039, 1047, 501 N.E.2d 1370.) Improper site control in violation of the Motor Vehicle Franchise Act can be accomplished by a franchisor through provisions of a lease, but that clearly is not the only means by which it may occur. We are not persuaded that the legislature intended that restrictions effecting site control would be considered unreasonable and prohibited only when found in a lease. The jury here considered that the conduct of the Manufacturer in applying the terms of its contract with the Dealer resulted in an unreasonable restriction on the Dealer to control the location of its business. To limit the jury solely to consideration of a lease arrangement, which does not exist here, would effectively remove the protection to a dealer intended by the Act. We find that the trial court properly instructed the jury as to site control.

The Manufacturer next contends that the court erred by failing to instruct the jury as to the provisions of the Motor Vehicle Franchise Act relating to notice to a dealer of his violation of a franchise contract. However, as the Manufacturer has not offered any citation to authority to support this argument, it will not be considered. (See 113 Ill. 2d R. 341(e)(7).) In its reply brief, the Manufacturer reargues similar issues with a discussion of numerous cases, but arguments raised for the first time in a reply brief will not be considered. See 113 Ill. 2d R. 341(g).

The Manufacturer contends that the trial court improperly instructed the jury as to the standard to be applied in determining whether it was guilty of willful and wanton misconduct. However, the Manufacturer did not object to the definition of willful and wanton misconduct tendered at the instruction conference on the present grounds urged that statutory violations carry a special standard of willful and wanton conduct. The Manufacturer's only objection to the instruction in trial was that the Dealer's initial willful and wanton instruction omitted the parenthetical language of Illinois Pattern Jury Instructions, Civil, No. 14.01 (2d ed. 1971). The Dealer subsequently resubmitted the instruction with the parenthetical language, and the Manufacturer's further objection then was not on the grounds now urged, but that the issue should not be submitted to the jury. The

Manufacturer's present objection to the definition of willful and wanton given to the jury was first raised in its post-trial motion. As the purpose of the instructions conference is to give counsel an opportunity to object to any proposed instruction, a party cannot allow the jury to receive the instruction without specific objection and claim for the first time in a post-trial motion that error was committed. (*Stephenson v. Dreis & Krump Manufacturing Co.* (1981), 101 Ill. App. 3d 380, 387, 428 N.E.2d 190.) The argument is waived.

■ The Manufacturer next contends that the issue of its claimed breach of .contractual duties to the Dealer, the second theory of recovery alleged in Dealer's complaint, should not have been submitted to the jury. However, no objection was made at the instruction conference and objections to jury instructions must be preserved at that time. (See *Lapidus v. Hahn* (1983), 115 Ill. App. 3d 795, 802, 450 N.E.2d 824.) In its reply brief, the Manufacturer argues that it moved for a directed verdict on the breach of contract count, which was denied, and it was therefore not necessary to repeat its objections. However, the Manufacturer fails to cite any authority for this proposition, and it will not be considered. It was proper here for the jury to be instructed on the contract issues presented, the legal principles to be applied, and the facts that must be proved. See *Friedman v. Park District* (1986), 151 Ill. App. 3d 374, 388, 502 N.E.2d 826.

The Manufacturer contends next that the jury was improperly instructed that the conduct of the parties may be taken into consideration when deciding the issue of the alleged breach of contract. The jury was instructed, over the Manufacturer's objection, that:

> "Every contract implies good faith and fair dealing between the parties. The law implies a promise against arbitrary and unreasonable conduct."

The court further instructed the jury:

> "Whether the parties to a contract gave it a particular construction may be regarded by you in giving effect to the provisions of the contract. The subsequent acts of the parties showing the construction that they themselves have put upon the agreement may be considered by you for the purpose of assisting you in arriving at a determination of what the arrangement was between the parties. Whether or not the parties gave the contract any particular construction is for you to decide."

The Manufacturer asserts that these instructions emphasize isolated portions of the evidence and should not have been given because instructions which single out particular facts or evidence and give them undue prominence are erroneous. *Reed v. Northwestern Publish-*

*ing Co.* (1988), 124 Ill. 2d 495, 524, 530 N.E.2d 474.

■ ■ The Dealer offered evidence that it had moved its location once before with the Manufacturer's knowledge and apparent acquiescence, but without its written approval. The Manufacturer argues that the instruction suggests that any departure by the Manufacturer from a particular course of conduct (acquiescence to a change in location) amounted to a breach of contract and was in error, as was the instruction emphasizing the implied covenant of good-faith and fair-dealing aspects of the contract. However, as the trial court correctly determined, these instructions accurately state the law of Illinois. (See *Borys v. Josada Builders, Inc.* (1982), 110 Ill. App. 3d 29, 33, 441 N.E.2d 1263, 1266 ("It is well established that every contract contains an implied promise of good faith and fair dealing between the contracting parties"); *Board of Trade v. Dow Jones & Co.* (1982), 108 Ill. App. 3d 681, 689, 439 N.E.2d 526, 532 ("The courts will adopt a reasonable construction of a contract which is placed on the contract by the conduct of the parties").) Additionally, the instructions as tendered by the Dealer were modified by the trial court to be phrased in the alternative so that the jury could consider or disregard the conduct of the parties. We do not find that these instructions improperly single out any aspect of the evidence.

Finally, the Manufacturer argues that the verdict was against the manifest weight of the evidence because the Dealer failed to prove by a preponderance of the evidence that the Manufacturer acted arbitrarily, in bad faith, or unconscionably, that the Manufacturer had good cause to terminate Dealer's dealership, that the Manufacturer did not violate the Act by exercising unreasonable "site control," and that the Dealer did not demonstrate that the Manufacturer failed to renew its franchise without good cause.

■ The Dealer alleged in its complaint that the Manufacturer violated section 4(b) of the Act, which provides, in relevant part:

"It shall be deemed a violation for any manufacturer *** to engage in any action with respect to a franchise which is arbitrary, in bad faith or unconscionable and which causes damage to any of the parties or to the public." Ill. Rev. Stat. 1987, ch. 121½, par. 754(b).

No Illinois court has interpreted this provision. The Manufacturer argues that because its actions were based on its good-faith belief that the change from a single-line dealership to multiline motorcycle sales would lead to a loss of sales of Kawasaki products, its actions were reasoned and rational, were not taken in bad faith, and were not unconscionable. However, implicit in this Act is the idea that a dealer

should not be terminated for affiliating with a competing line (see Ill. Rev. Stat. 1987, ch. 121½, par. 754(e)(12)), and the Manufacturer's argument does not provide a defense in this case to the claimed section 4(b) violation as the franchise agreement permitted multiline sales by the Dealer, but it was terminated for doing so here.

Next, the Manufacturer contends that it had good cause to terminate the contract between it and the Dealer as the Manufacturer would be damaged by the Dealer's move to a location from which Honda products were sold.

In *Dayan v. McDonald's Corp.* (1984), 125 Ill. App. 3d 972, 466 N.E.2d 958, the standard of "good cause" necessary to terminate a franchise under the common law was examined:

> "Good cause has been defined as a failure to substantially comply with obligations under the agreement. [Citations.] One commentator has also noted that the test used by most courts *** seems to center on a determination of commercial reasonability. Breaches of contract affecting the interest of the franchisor in marketing his product constitute good cause for termination." (*Dayan*, 125 Ill. App. 3d at 993, 466 N.E.2d at 973.)

However, in that case, the franchise was in a deplorable condition and there had been numerous customer complaints. (*Dayan*, 125 Ill. App. 3d at 995, 466 N.E.2d at 973.) Here, the Dealer was willing to market Kawasaki products in accordance with contract requirements for multiline dealerships, and the Manufacturer was only interested in terminating the Dealer to prevent competition with Honda. We cannot find, as a matter of law, that the Manufacturer had good cause to terminate the franchise.

The Manufacturer argues that it did not impose unreasonable site control upon the Dealer as many dealership contracts of other manufacturers contain a similar restriction. However, a site-control provision in a franchise agreement will not be considered as a *prima facie* violation; it is only when a manufacturer unreasonably applies this provision that a violation of the Motor Vehicle Franchise Act will be found.

On consideration of the Manufacturer's arguments, we find that the verdict was not against the manifest weight of the evidence.

In its cross-appeal, the Dealer contends that the trial court erred in denying statutory relief as the unlawful termination of the franchise by willful and wanton conduct justifies the treble damages provided for in the Act.

Under the first count of its compliant, which alleged violation of the Motor Vehicle Franchise Act, the Dealer sought actual damages

and prayed that such amount be trebled because defendant's conduct was willful and wanton. The jury returned a verdict for the Dealer and against the Manufacturer for $323,690 as actual damages. The trial court also submitted a special interrogatory to the jury, which responded that the Manufacturer's conduct which proximately caused the plaintiff's damages was willful and wanton. The court awarded attorney fees to the Dealer in the amount of $79,422.50, and entered judgment on the verdict of $323,690; it refused the Dealer's request to treble the damages, finding that to be unwarranted.

Section 13 of the Act provides in relevant part:

"Where the misconduct is willful or wanton, the court may award treble damages. *** Where the franchisee or dealer substantially prevails the court *** shall award attorney's fees and assess costs against the opposing party." Ill. Rev. Stat. 1987, ch. 121½, par. 763.

Although the Dealer contends that the legislature intended to mandate treble damages where the franchisee's conduct was willful and wanton, the language of the statute is unambiguous and provides that the power to award treble damages is permissive, not mandatory, on the part of the court.

The Manufacturer argues that unfair competition and practices and unreasonable dealer or franchise restrictions are in two different parts of the Motor Vehicle Franchise Act, and treble damages apply only to the former.

Section 13 provides in relevant part:

"Damages; equitable relief. Any franchise or motor vehicle dealer who suffers any loss of money or property, real or personal, as a result of the use or employment by a manufacturer *** of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by this Act may bring an action for damages and equitable relief, including injunctive relief. Where the misconduct is willful or wanton, the court may award treble damages." Ill. Rev. Stat. 1987, ch. 121½, par. 763.

Section 4 states in relevant part:

"Unfair competition and practices. (a) The unfair methods of competition and unfair and deceptive acts or practices listed in this Section are hereby declared to be unlawful." Ill. Rev. Stat. 1987, ch. 121½, par. 754.

The Manufacturer argues that section 13 tracks the language of section 4, and treble damages may, therefore, be applied only to the acts and practices defined and set forth in section 4. It asserts that

although the jury found that the Manufacturer had violated the Act, but did not specify which provisions were violated, it is evident that the jury found the Manufacturer exercised site control. As unreasonable restrictions on a dealer relative to site control are declared unlawful under section 7, the Manufacturer argues that treble damages are not available on this cause of action as the legislature did not intend to punish unreasonable conduct, but unfair conduct. However, at the instruction conference, the Manufacturer offered its own instruction which also included unreasonable restrictions among unfair methods of competition and unfair deceptive acts or practices. The Manufacturer's instruction was rejected in favor of the Dealer's, and it cannot now be heard to argue that a given instruction was erroneous when it tendered an instruction containing the same language. It is clear that all grounds for objection should be particularly specified at the instruction conference and renewed in the post-trial motion. (107 Ill. 2d R. 239(b); *Bean v. Norfolk & Western Ry. Co.* (1980), 84 Ill. App. 3d 395, 410, 405 N.E.2d 418.) There is no suggestion made in the Act that the legislature intended to limit damages, equitable relief, and treble damages to actions described in only one section of the Act.

The Dealer argues that in submitting a special interrogatory on willful and wanton conduct to the jury, any discretion on an award of treble damages was thereby delegated to the jury and the trial court was divested of any discretion in this issue. The Dealer has not cited any legal authority for this argument (see 113 Ill. 2d R. 341 (e)(7)), and we do not find it persuasive.

 █ In arguing that treble damages must be awarded and that this court should reverse the findings of the trial court, the Dealer cites a number of cases, but does not address the issue of reviewing the exercise of discretion by the trial court. Only where the trial court has abused its discretion will the reviewing court step in and substitute its judgment. (*In re Marriage of Carlson* (1981), 101 Ill. App. 3d 924, 929, 428 N.E.2d 1005.) The trial judge explained his decision not to award treble damages, stating that his order was not a judgment notwithstanding the verdict of the jury as to liability, damages, or the special findings of willful and wanton, but that the court merely found that the imposition of treble damages was not warranted in this case, a finding with which we agree. In the context of punitive damages, the measure is usually for the jury, but the statute in this case gives the trial judge discretion whether to impose treble damages. A jury finding of willful and wanton conduct determines a question of fact, and it is then within the discretion of the trial judge, as a matter of law, whether or not to impose treble damages in light

of the evil to be punished and the measures necessary to correct it.

In deciding in this case whether to award treble damages, the trial court made the following findings:

"(1) punitive damages are not favored;

(2) punitive damages are not usually awarded in contract cases;

(3) the trial court is usually required to supervise jury verdicts of willful and wanton conduct, and here, the compensatory damages awarded did more than merely compensate; and

(4) this action was new and novel."

Our supreme court has held that the general rule against punitive damages for breach of contract has no application where the cause of action is premised upon a separate and independent legal basis. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 187, 384 N.E.2d 353.) In the same decision, the court refused to impose punitive damages on a "new and novel" cause of action. There, the court judicially created the tort of retaliatory discharge where an employee is fired for filing a worker's compensation claim (*Kelsay*, 74 Ill. 2d at 188), whereas here, a statutory cause of action was already the law. However, for the reasons stated by the trial court, we find that imposition of treble damages is not warranted in this matter.

As treble damages were not awarded, we need not consider the Manufacturer's further argument that the treble damages provision of the Motor Vehicle Franchise Act is unconstitutionally vague and overly broad.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

McLAREN and REINHARD, JJ., concur.